IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSEMARY TOURNEUR, *Plaintiff* | : : : | CIVIL ACTION |
| v. | : : | |
| NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK, et al. *Defendants* | : : : | No. 23-1580 |

## **MEMORANDUM**

PRATTER, J.                                                                                     MARCH 12, 2024

Amtrak allegedly withdrew an offer of employment from Ms. Tourneur because of her pregnancy and used her false-positive drug test as a pretext. In addition to suing Amtrak, Ms. Tourneur has sued University Services MRO and Dr. Philip Lopez, the company and individual responsible for performing the allegedly false-positive drug test, for wrongful discharge and negligence. However, neither University Services MRO nor Dr. Lopez ever employed Ms. Tourneur, and they did not owe her a duty of care under Pennsylvania law. Thus, the Court grants the motions to dismiss.

### BACKGROUND

On September 9, 2021, Ms. Tourneur accepted a job with Amtrak as a Facilities Development Manager and simultaneously disclosed that she was pregnant. Amtrak requires all employees to take a pre-employment drug test before starting work. Ms. Tourneur gave Amtrak a hair specimen for the drug test on September 15.

Amtrak did not test the specimen itself. Instead, it provided the hair to non-party Quest Diagnostics,[1] which performs Amtrak's pre-employment drug testing. Quest Diagnostics provided

---

[1] Quest Diagnostics was originally named as a defendant in this case, but Ms. Tourneur stipulated to the dismissal of Quest Diagnostics as a defendant on September 15, 2023.

1

the specimen to Defendant University Services MRO, which gave the specimen to Defendant Dr. Philip Lopez to perform the drug test.

On September 25, Ms. Tourneur's hair specimen tested positive for cocaine, and Dr. Lopez informed Ms. Tourneur of her test result. On September 27, Ms. Tourneur advised Amtrak that she had been prescribed Labetalol, which was known to cause false positive drug test results. Ms. Tourneur explained to Amtrak that the Labetalol was prescribed due to hypertension related to her pregnancy. Ms. Tourneur furnished Amtrak with a copy of her Labetalol prescription.

Amtrak instructed Ms. Tourneur to contact Quest Diagnostics, University Services, and Dr. Lopez about her conclusion of a false positive. Ms. Tourneur promptly notified Quest Diagnostics, University Services, and Dr. Lopez about her conclusion of a false positive "via contact with [Dr.] Lopez." Compl. ¶ 37, Doc. No. 1. Ms. Tourneur requested a second drug screening, and Dr. Lopez instructed her to direct that request to Amtrak.

Ms. Tourneur was not furnished the opportunity for a second drug screening, though Amtrak has allegedly provided employees with such an opportunity in the past in similar circumstances. Ms. Tourneur avers that Amtrak refused to provide her the same opportunity "because of Plaintiff's notification of her pregnancy."

On October 6, 2021, Amtrak rescinded its offer of employment to Ms. Tourneur. Ms. Tourneur independently obtained a drug screening from a third party, which returned a negative result for all controlled substances. She provided Amtrak with this negative result on an unknown date[2] and informed Amtrak of her belief that the rescission was due to her pregnancy, not the false positive drug test. Amtrak took no further action after rescinding Ms. Tourneur's offer of employment.

---

[2] Ms. Tourneur's Complaint appears to contain a typographical error where the date should appear. Compl. ¶ 47, Doc. No. 1 ("On or about DATE, Plaintiff provided . . .").

Ms. Tourneur filed a six-count complaint against Amtrak, University Services, and Dr. Lopez on April 26, 2023. However, she avers just two counts against both University Services and Dr. Lopez: wrongful discharge and negligence. Ms. Tourneur's six claims against Amtrak, which has filed an answer to her complaint, are not the subject of this opinion.

## LEGAL STANDARD

At the motion to dismiss stage, the Court must accept factual allegations as true, but it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

### I. Ms. Tourneur has not adequately pled claims for wrongful discharge against University Services and Dr. Lopez.

Ms. Tourneur avers that University Services and Dr. Lopez violated "Pennsylvania Common Law" by wrongfully discharging her. Compl. at 10, Doc. No. 1. "Generally, in Pennsylvania, there is no common law cause of action *against an employer* for termination of an at-will employment relationship." *Bukovinsky v. G4S Solutions*, No. 1260 WDA 2014, 2015 WL 6689552, at *3 (Pa. Super. Ct. Aug. 14, 2015) (emphasis added) (citing *Krajsa v. Keypunch, Inc.*, 622 A.2d 355, 358 (Pa. Super. Ct. 1993)). The Commonwealth has recognized exceptions to this rule "where discharges of at-will employees would threaten clear mandates of public policy." *Krajsa*, 622 A.2d at 358 (quoting *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917,

3

918 (Pa. 1989)). However, the Court need not examine whether any such exception applies here because the rule is inapposite in the first place. Ms. Tourneur was never employed by University Services or Dr. Lopez. Thus, neither the general rule of at-will employment nor the exception to that rule—namely the tort of wrongful discharge—applies to these two defendants.

The Court dismisses with prejudice Ms. Tourneur's claims for wrongful discharge against University Services and Dr. Lopez.

## II. Neither University Services nor Dr. Lopez owed Ms. Tourneur a duty of care.

To adequately plead her negligence claims against University Services and Dr. Lopez, Ms. Tourneur must plausibly plead that these defendants: (1) owed Ms. Tourneur a duty of care, (2) breached that duty of care, and (3) injured Ms. Tourneur as a result of that breach, which caused (4) Ms. Tourneur to suffer actual damages. *See R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005). To determine whether a duty is owed under Pennsylvania law, the Pennsylvania Supreme Court considers the *Althaus* Factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." *Miller v. Amazon.com Servs., Inc.*, 543 F. Supp. 3d 80, 86 (E.D. Pa. 2021) (citing *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003)). The Pennsylvania Supreme Court has never squarely found that a medical laboratory performing pre-employment drug tests owes an actionable duty to the subject of a pre-employment drug test. *Id.* Lacking a clear pronouncement from the Pennsylvania courts, differing conclusions have been reached here in the Eastern District of Pennsylvania about the existence of duties comparable to the one Ms. Tourneur claims she was owed by University Services and Dr. Lopez. *Compare Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 505-07 (E.D. Pa. 2010) (applying *Althaus* factors and finding medical laboratory, which refused to allow plaintiff to provide information explaining false

4

positive, owed duty of care to plaintiff to accurately process and report pre-employment drug test to plaintiff's employer), *with Miller*, 543 F. Supp. 3d at 87 (expressly disagreeing with *Warshaw* and predicting Pennsylvania Supreme Court "would not . . . impose a duty to report the existence of a current or prospective employee's Pennsylvania medical marijuana license to a current or prospective employer").

The parties' briefing centers around whether the present case is controlled by *Sharpe v. St. Luke's Hospital*—a 2003 Pennsylvania Supreme Court case that did recognize an arguably analogous duty. In that case, Ms. Sharpe was directed to St. Luke's Hospital to undergo a routine, random drug test for her job at Federal Express. *Sharpe*, 821 A.2d at 1216–17. Ms. Sharpe alleged that the hospital negligently caused her urine to be mislabeled, resulting in a false positive for cocaine. *Id.* at 1217. The Pennsylvania Supreme Court applied the *Althaus* Factors to determine that the hospital owed Ms. Sharpe "a duty of reasonable care with regard to collection and handling of her urine specimen for [] employment-related drug testing." *Sharpe*, 821 A.2d at 1221.

University Services and Dr. Lopez argue that the duty imputed to them by Ms. Tourneur is more expansive than the duty recognized in *Sharpe*, and they focus on two distinctions between *Sharpe* and the present case to make this point. First, they emphasize that, although Ms. Sharpe was already employed by Federal Express, here Ms. Tourneur took a *pre*-employment drug test that *preceded* her employment by Amtrak. They argue that *Ney v. Axelrod*—a 1999 Pennsylvania Superior Court decision—adopted this distinction. 723 A.2d 719 (Pa. Super. Ct. 1999). Mr. Ney had been hired by a chemical company, which required pre-employment drug screening. *Id.* at 720. When Mr. Ney's drug test came back positive, his application for employment was denied, and Mr. Ney sued the drug testing company for negligence. *Id.* at 720–21. The Pennsylvania Superior Court declined to find that medical laboratories which contract with third parties for

5

employment-related drug testing owe a duty to test subjects because the harm suffered by those subjects "is speculative at best." *Id.* at 722. That court was also "reticent to lend credence to future plaintiffs' claims that they have suffered a 'loss of employment advancement opportunity' in such a situation where a plaintiff has not passed the final stages in a hiring process, and, therefore, is not even an 'employee,'" because, "an employer may be selective about the persons he employs as long as he does not unlawfully discriminate among the applicants." *Id.* (quoting *Phila. Elec. Co. v. Hum. Rels. Comm'n (English)*, 448 A.2d 701, 708 (Pa. Commw. Ct. 1982)). Although this Court shares this reticence, the Court also finds *Ney* to be minimally instructive insofar as the case pre-dates the Pennsylvania Supreme Court's enunciation of the *Althaus* factors. Thus, although *Ney* has never been explicitly overruled, its analysis did not apply the now-governing *Althaus* factors.

The second distinction between *Sharpe* and the present case that is drawn by the moving defendants is more compelling: *Sharpe* recognized a duty of care in the "collection and handling" of drug-testing specimens, *Sharpe*, 821 A.2d at 1221, but Ms. Tourneur avers duties over and above the collection and handling of specimens. Ms. Tourneur does not contend that University Services or Dr. Lopez negligently collected or handled her hair. Furthermore, Ms. Tourneur does not contend that the false positive was the result of any negligence by University Services or Dr. Lopez. Because Ms. Tourneur was taking medication that allegedly causes false positive drug test results, Compl. ¶ 34, Doc. No. 1, the fact that her hair yielded a positive drug test result suggests that University Services and Dr. Lopez performed an accurate drug test on the hair specimen that they received with the information they had in their possession.

However, Ms. Tourneur asserts that the moving defendants nonetheless owed her a duty of care beyond the non-negligent collection, handling, and testing of her hair specimen, namely the duty to take "remedial action" after Ms. Tourneur informed them of her suspicion that her

6

prescription Labetalol was the cause of her positive drug test. *See id.* ¶¶ 34-40. Faced with a similar fact pattern in *Miller*, the presiding judge declined to find that a drug testing company had a duty to report to the plaintiff's employer that the plaintiff had a medical marijuana license because "the Pennsylvania Supreme Court has not extended the duty described in *Sharpe* beyond the collection and handling of drug tests[.]" *Miller*, 543 F. Supp. 3d at 86-87, 87 n.4.

With this context in mind, the Court turns to the application of the *Althaus* factors. Factor one—the relationship between the parties—weighs slightly against finding a duty in this case. In *Sharpe*, the Pennsylvania Supreme Court found this factor to weigh in favor of finding a duty because Ms. Sharpe "personally presented herself to the Hospital, which was aware of the purpose of the urine screening[.]" *Sharpe*, 821 A.2d at 1219. By contrast, Ms. Tourneur provided her hair sample to Amtrak, Amtrak provided the hair sample to Quest Diagnostic, Quest Diagnostic provided the hair sample to University Services, and University Services provided the hair sample to Dr. Lopez to perform the test. Compl. ¶¶ 22, 24, 26, 28, Doc. No. 1. This chain-of-custody sequence signifies a much more attenuated relationship between Ms. Tourneur and the moving defendants than the relationship that existed between Ms. Sharpe and St. Luke's Hospital. Though St. Luke's was aware of the purpose of Ms. Sharpe's drug test when she personally appeared at St. Luke's to provide a urine sample directly, it is much less likely that University Services and Dr. Lopez were aware of the purpose of Ms. Tourneur's drug test when they stood at the end of this chain of custody over Ms. Tourneur's hair sample. This attenuated relationship weighs against finding a duty in this case.

On the other hand, Ms. Tourneur has pled that all three contracts that created such a chain of custody—namely the contract between Amtrak and Quest Diagnostics, the contract between Quest Diagnostics and University Services, and the contract between University Services and Dr.

7

Lopez—were all contracts "to perform pre-employment drug screenings." Compl. ¶¶ 23, 25, 27. The existence of contractual provisions specifying the purpose of the moving defendants' drug testing services would make it more likely that University Services and Dr. Lopez would know the purpose of Ms. Tourneur's drug test. However, Ms. Tourneur does not plead that all three of these contracts were *exclusively* to perform pre-employment drug screenings. Employers sometimes also order mid-employment drug screenings, and non-employers, such as parents and courts, sometimes order drug screenings for entirely non-employment-related reasons. Therefore, the Court cannot conclude whether University Services and Dr. Lopez were "aware of the purpose of the [hair] screening" in this case. *Cf. Sharpe*, 821 A.2d at 1219. Thus, the degree to which the moving defendants knew the purpose of the hair screening in Ms. Tourneur's case is basically uninstructive with respect to the first *Althaus* factor.

Finally, because the relationship between Ms. Tourneur and the moving defendants is so attenuated, it is unclear what "remedial action" University Services and Dr. Lopez would be required to take. They were under no contractual obligation to Ms. Tourneur to provide her with a second test, they had fulfilled their contractual obligation to complete a drug test upon the specimen they were provided, and Amtrak collected Ms. Tourneur's hair sample in the first instance, so they lacked a second sample upon which to conduct a second test. Although Ms. Tourneur avers that "*Amtrak* has provided employees with an opportunity for an alternate pre-employment drug test upon notification of a possible false positive drug test result[,]" Compl. ¶ 42, Doc. No. 1 (emphasis added), University Services and Dr. Lopez were powerless under the circumstances to provide Ms. Tourneur with that same opportunity. *Accord Miller*, 543 F. Supp. 3d at 87 (emphasis added) (finding first *Althaus* factor to weigh against finding duty where state statute "places the onus on the *employer* . . . to take into account an employee's report that they

are certified to use medical marijuana."). Thus, *Althaus* factor one weighs slightly against finding that University Services and Dr. Lopez owed Ms. Tourneur a duty to take remedial action when she asserted that her test result indicated a false positive.

The second *Althaus* factor— the social utility of the actor's conduct—also weighs against finding a duty here. Determining what controlled substances an individual has consumed is socially useful. As the Supreme Court of Pennsylvania has recognized, "participation in the drug testing process certainly has social utility." *Sharpe*, 821 A.2d at 1220; *see also Miller*, 543 F. Supp. 3d at 87 ("Quest's participation in the drug testing process has social utility . . . ."); *Warshaw*, 821 A.2d at 505-06 (same). University Services and Dr. Lopez participate in the drug testing process. Thus, this factor weighs against imposing an additional duty to remediate while they participate in this socially useful activity.

The third *Althaus* factor—the nature of the risk imposed and foreseeability of the harm incurred—does not weigh clearly in either direction here. The *Sharpe* court found this factor to weigh in favor of finding a duty because "the substantial harm deriving from inaccurate test results, which, in the context of [Ms.] Sharpe's employment-related screening, allegedly took the form of a termination of gainful employment, would be a foreseeable consequence of a breach of the duty of reasonable care." *Sharpe*, 821 A.2d at 1220. However, unlike the plaintiff in *Sharpe*, who was already gainfully employed by Federal Express, Ms. Tourneur was never employed by Amtrak, which "rescinded [Ms. Tourneur's] employment offer." Compl. ¶ 44, Doc. No. 1. The Court does not find that the substantial harm suffered by the loss of a job is equivalent to the harm suffered by the withdrawal of a job offer. *Cf. Ney*, 723 A.2d at 722 (internal quotation marks omitted) (declining to find plaintiff, who "has not passed the final stages in a hiring process, and, therefore, is not even an employee," suffered loss of employment opportunity). Additionally, as discussed

9

above, the relationship between Ms. Tourneur and both University Services and Dr. Lopez was much more attenuated than the relationship between Ms. Sharpe and the hospital that performed her drug test. The prospect of Ms. Tourneur's job offer rescission was thus less foreseeable to University Services and Dr. Lopez than the prospect of Ms. Sharpe's termination was to St. Luke's Hospital. Still, the prospect of the rescission was not entirely unforeseeable: University Services and Dr. Lopez could surmise that at least some of their drug tests were for pre-employment screening purposes. Thus, *Althaus* factor three does not clearly weigh in either direction here.

The fourth *Althaus* factor—the consequences of imposing a duty upon the actor—weighs against finding a duty to remediate under these circumstances. In *Sharpe*, where St. Luke's Hospital collected the test specimen and performed the test, the Pennsylvania Supreme Court found that the hospital was "in the best position to ensure the non-negligent collection and handling of the specimen[.]" *Sharpe*, 821 A.2d at 1220. In *Sharpe*, St. Luke's Hospital retained authority over how to collect and handle the specimen, but in the present case, Amtrak collected Ms. Tourneur's hair specimen and retained authority over how to handle the alleged false positive. Any effort University Services and Dr. Lopez made to "remediate" may have been futile depending upon how Amtrak chose to exercise that authority. If any party to the present case were to have a duty to remediate, Amtrak would be the "entity . . . in the best position" to take remedial action in light of Ms. Tourneur's disclosure of her Labetalol prescription. *Id.* Thus, it would be inappropriate to impose that duty upon University Services and Dr. Lopez, and this factor weighs against finding a duty to remediate. The propriety of this finding is underscored by the *Miller* court's observation that the utility of participation in the drug testing process "does not extend to advising employers . . . that the employee has acquired a Pennsylvania medical marijuana license." *Miller*, 543 F. Supp. 3d at 87. Similarly, the Court finds that the utility of the drug testing process does not extend

10

to taking remedial action when a test subject reports that they have been prescribed a medication known to result in false positives.

The fifth *Althaus* factor—the overall public interest in the proposed solution—weighs against finding a duty here. It is in the public interest that employers do not rescind job offers based on the false perception of drug use. It is also in the public interest that socially useful drug testing services perform drug tests without incurring liability for failing to take remedial action when test subjects are dissatisfied with the outcome of their drug test. Employers are in a much better position to take remedial action, such as ordering a second drug test, than the drug testing services with which employers enter into contracts. Thus, the Court finds that the public interest weighs against imposing a duty to remediate upon drug testing servicers, such as University Services and Dr. Lopez.

Balancing the *Sharpe* factors, the Court finds that University Services and Dr. Lopez did not owe Ms. Tourneur a duty to take remedial action in light of her Labetalol prescription. Thus, the Court dismisses with prejudice Ms. Tourneur's negligence claims against University Services and Dr. Lopez.

## CONCLUSION

The Court dismisses with prejudice all of Ms. Tourneur's claims against University Services and Dr. Lopez. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE